J-S01001-23, S01002-23, S01003-23 & S01004-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.K., A MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 934 WDA 2022 |

Appeal from the Order Entered July 20, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): CP-02-AP-0000157-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: A.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.K., A MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 936 WDA 2022 |

Appeal from the Order Entered July 20, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): CP-02-AP-0000157-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: A.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN, YOUTH AND FAMILIES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 935 WDA 2022 |

Appeal from the Order Entered July 20, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000157-2021

IN THE INTEREST OF: A.K., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
 :
 :
APPEAL OF: ALLEGHENY COUNTY :
OFFICE OF CHILDREN, YOUTH :
AND FAMILIES :
 :
 : No. 937 WDA 2022

Appeal from the Order Entered July 20, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000157-2021

IN THE INTEREST OF: M.P., A : IN THE SUPERIOR COURT
MINOR : OF PENNSYLVANIA
 :
 :
APPEAL OF: ALLEGHENY :
COUNTY OFFICE OF CHILDREN, :
YOUTH AND FAMILIES :
 :
 : No. 938 WDA 2022

Appeal from the Order Entered July 20, 2022
In the Court of Common Pleas of Allegheny County Orphans'
Court at No(s): CP-02-AP-0000156-2021

IN THE INTEREST OF: M.P., A : IN THE SUPERIOR COURT
MINOR : OF PENNSYLVANIA
 :
 :
APPEAL OF: M.P., A MINOR :
 :
 :
 :
 :
 : No. 939 WDA 2022

Appeal from the Order Entered July 20, 2022
In the Court of Common Pleas of Allegheny County Orphans'
Court at No(s): CP-02-AP-0000156-2021

J-S01001-23, S01002-23, S01003-23 & S01004-23

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED: MARCH 9, 2023**

These appeals were filed by the Allegheny County Office of Children, Youth and Families (CYF) and by KidsVoice, the Guardian *Ad Litem* (GAL), on behalf of A.K. (born in August of 2019) and M.P. (born in December of 2015) (collectively Children), from the July 20, 2022 orders issued by the Court of Common Pleas of Allegheny County, Orphans' Court Division, denying CYF's petitions requesting the involuntary termination of the parental rights of M.F. (Mother), the birth mother of A.K. and M.P., and of D.K. (Father), the birth father of A.K.  Following our review, we affirm the orders on appeal.[1]

The trial court's extensive opinion sets forth a detailed explanation of the facts and procedural history of this case that led to the orders now on appeal.  The opinion includes a history of the family's interactions with CYF.  It also provides a discussion concerning the testimony of the various witnesses, who testified at the hearings held on June 3, June 13, and June 22 of 2022.  One of the witnesses was Terri Wayne, a CYF caseworker, who was involved in the case from its inception in July of 2018.  The court also heard testimony from Scott Priestley, a retired police officer, and Joy Hall, an investigation manager who worked for a private investigation firm, both of whom were involved in locating the family in Tennessee, after they had left

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] This Court consolidates these appeals *sua sponte* in that they involve related parties and issues.  **See** Pa.R.A.P. 513.

- 3 -

the Allegheny County area. The court also heard testimony from Dr. Patricia Pepe, a psychology expert, who evaluated both Mother and Father and their interaction with the Children. The court's opinion also includes an extensive recitation of the testimony given by Mother and Father, provides a discussion about their assigned goals, and the progress they made.

Then, following its explanation of the standard of review that this Court applies to an appeal in an involuntary parental termination matter, the trial court set forth the language of the applicable statute, *i.e.*, 23 Pa.C.S. § 2511(a) and (b), and discusses the basis for its decision to deny the petitions filed by CYF. Specifically, the opinion explains the court's reasons for concluding that CYF had failed to meet its burden of proof, citing the three incidents on which CYF mainly relied — namely, the Tennessee abscondence, the birthday party incident, and the herb incident. The opinion also contains specifics as to the trial court's credibility determinations, concluding that CYF failed to meet its burden of proof.

Both CYF and KidsVoice on behalf of the Children filed appeals. Their briefs contain issues asserting that the trial court erred as a matter of law and/or abused its discretion in denying the termination petitions in that the evidence they presented proved that the grounds for termination existed under 23 Pa.C.S. § 2511(a) and that the termination would serve the Children's needs and welfare under 23 Pa.C.S. § 2511(b).

Essentially, the arguments asserted by CYF and KidsVoice are requesting that this Court re-find facts and re-weigh the evidence presented.

However, our standard of review does not permit us to function in this manner. Rather,

> [t]he standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted). Applying this standard, we conclude that the trial court's findings are based on competent evidence contained in the record and its conclusions are not unreasonable.

We have reviewed the certified record, the parties' briefs, the applicable law, and the thorough, well-reasoned opinion authored by the Honorable Tiffany Sizemore of the Court of Common Pleas of Allegheny County, dated September 23, 2022. We conclude that Judge Sizemore's opinion properly disposes of the issues presented by CYF and KidsVoice. Accordingly, we adopt the trial court's opinion as our own and affirm the orders denying the termination petitions on that basis.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  3/9/2023

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN THE INTEREST OF:        :    **CHILDREN'S FAST TRACK APPEAL**

A.K. and M.P.,            :    OPINION
minors.                :

                     :    Docket No.:      CP-02-AP· 1 57 -2021
                     :                      CP-02-AP 156-2021
                     :                      934 WDA 2022
                     :                      936 WDA 2022
                     :

**BY:**
Honorable Tiffany  Sizemore
440 Ross  Street
Room 526
Pittsburgh, PA, 15219

COPIES TO:

Superior Court of Pennsylvania
Bobbi Jo Wagner, Esquire
Deputy Prothonotary
310 Grant St, Suite 600
Pittsburgh, PA 15219

Erin Krotosynzki, Esquire
(Guardian *ad litem* for Appellants)
Kids Voice
437 Grant Street, Suite 700
Pittsburgh, Pa 15219

Ilene L. Dubin, Esquire
(Counsel for Appellant)
Fort Pitt Commons, Suite 101
445 Fort Pitt Boulevard
Pittsburgh, PA 15219

Joseph Luvara
(Counsel for parents)
Two PPG Place, Suite 440
Pittsburgh, PA 15222


FILED
22 SEP 23 PM 3:57
DEPT. OF COURT RECORDS
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

| | |
|---|---|
| IN THE INTEREST OF: | : **CHILDREN'S FAST TRACK APPEAL** |
| | : |
| A.K. and M.P., | : OPINION |
| minors. | : |
| | : Docket No.:    CP-02-AP-000130-2021 |
| | : |
| | : 934 WDA 2022 |
| | : 936 WDA 2022 |
| | : |
| | : |
| | : |

OPINION

SIZEMORE, J.                                                                    September 22, 2022

On July 5, 2022, following three days of evidentiary hearings on June 3, 2022, June 13, 2022, and June 22, 2022., on the above-captioned matters, this Court issued Orders denying both of Allegheny County Office of Children, Youth and Families' ("CYF") petitions for involuntary termination of the parental rights of M.F. ("Mother"), the birth mother of the two minors, and D.K. ("Father"), the birth father of A.K.

This Court denied CYF's petitions to terminate the parental rights of Mother to both children and denied the petition to terminate the rights of Father to A.K., his biological child. Following the Court's Orders, CYF and the Guardian Ad Litem for appellants A.K. and M.P. timely filed a concise statement of matters complained of on appeal. For the reasons set forth below, the Orders of this Court should be affirmed.

1

## BACKGROUND

### I. History of Family with CYF

Terri Wayne, a caseworker for Allegheny County CYF (hereinafter "CYF"), provided testimony about her history with the family. *See* Transcript of Testimony, dated June 13, 2022 ("Tr. II"), at 62. Ms. Wayne has worked with mother, [mother] since the inception of the case. *Id.* at 63. Initially, in July 2018, [mother] called CYF and said she needed housing and financial support. *Id.* at 66. She reported that she had a two-year-old (M.P.) with no support in the area. *Id.* She was calling from Philadelphia and was trying to secure support for when she arrived in Pittsburgh. *Id.* at 67. She presented herself and M.P. on July 9, 2018, at a firehouse in a Pittsburgh neighborhood called East Liberty. *Id.* The agency connected her to Allegheny Links and a local shelter called Womenspace East. *Id.* However, [mother] left the firehouse with M.P. prior to being able to get services in place. *Id.*

Ms. Wayne further testified that she went looking for [mother] and M.P. and employed the agency CSI unit to help. *Id.* She was particularly concerned because [mother] had been seen talking to herself and had displayed some rapid speech patterns. *Id.* Eventually the agency caught up with her in an empty house, where it was believed that M.P.'s father used to live. *Id.*

[mother] indicated to Ms. Wayne that she and M.P. no longer needed services. *Id.* at 69. However, she did eventually agree to meet up with Ms. Wayne and do a standard intake interview. *Id.* During the intake interview, [mother] said that she was overwhelmed and came to Pittsburgh looking for M.P.'s father. *Id.* She said that she was in Philadelphia

2

working on political activism matters that were important to her. Prior to Philadelphia, she had been in the state of Florida. *Id.*

Mother reported having behavioral health issues since around the age of three. *Id.* at 70. She said that these issues were the result of trauma in the child welfare system. *Id.* She had been first removed from her biological parents at three-years-old and then again at age five. *Id.* She indicated that she had several mental health diagnoses, including bipolar disorder, post-traumatic stress disorder (PTSD), and sex addiction.[1] *Id.*

Following this intake interview, CYF decided not to remove M.P. from the care of Mother *Id.* at 73. Mother presented as cooperative and having insight into her diagnoses. Mother stated that she had been out of mental health treatment for a while and needed to get back involved. *Id.* at 70. According to Ms. Wayne, Mother was talking "nonstop" but had insight into what was happening. *Id.* at 71. Ms. Wayne assessed the situation as a parent asking for assistance, and not as a dangerous situation. *Id.* The agency assigned in-home services to Mother and set up a teaming meeting within the first week. *Id.* Mother was connected to Department of Human Services (hereinafter "DHS") housing supports and reported that she had some job interviews set up. *Id.*

Ms. Wayne also met with M.P. during this initial period of contact with CYF. *Id.* at 72. She noticed some issues with his demeanor and pointed it out to Mother *Id.* at 72-73. According to Ms. Wayne, Mother denied that the behaviors were happening. *Id.*

---

[1] The Court notes that later in her testimony, Ms. Wayne stated that there were facts and circumstances from this initial interview that CYF decided were untrue. However, with the exception of one instance, Ms. Wayne's testimony was largely based on inadmissible hearsay that the Court did not consider reliable. Tr. II at 74.

On July 23, 2018, CYF was notified by the shelter that RESOLVE (crisis mental health services) had to be called to the shelter because of an incident with *Mother* ~~████████~~. *Id.* at 77. It was reported that she had made some sort of herbal mixture that would cause her to have a heart attack, as she intended to kill herself. *Id.* at 79. Prior to ingesting the herbs, *Mother* ~~████~~ took M.P. to a firehouse where Mr. Palmer was working as an EMT. *Id.* Mr. Palmer took M.P. and went back to the shelter. *Id.* at 78. The Shelter, in turn, called RESOLVE. *Id.* *Mother* ~~████████~~ agreed to let CYF take M.P. to Jeremiah's Place and she went to the University of Pittsburgh Western Psychiatric Hospital (hereinafter "WPIC"). *Id.* WPIC admitted *Mother* ~~████~~ to the hospital for psychiatric treatment. *Id.* at 80.

CYF applied for an emergency care authorization (ECA) to place M.P. in its custody and the application was approved. *Id.* Ms. Wayne picked up M.P. from Jeremiah's Place and placed him in an emergency placement through Pressley Ridge. *Id.* He went to the foster home of *S.B.* ~~████████~~. *Id.*

In the meantime, *Mother* ~~████████~~ was discharged from WPIC and went back to the shelter, but she was not permitted because she no longer had a child with her, which was a requirement of that program. *Id.* As a result, *Mother* ~~████████~~ left the shelter and went to stay with *Father* ~~██████████████████~~. *Id.* *Mother* ~~████████~~ reported that she was attending outpatient treatment at WPIC but, according to Ms. Wayne, *Mother* ~~████████~~ would not sign a Release of Information so that CYF could get any records of her treatment. *Id.* at 83. In fact, Ms. Wayne testified that

4

up until the present date of her testimony, Mother had never signed a Release of Information for the agency to receive records of mental health treatment.[2]

Mother also began working with an in-home service provider called Every Child, getting her public benefits transferred from Philadelphia to Pittsburgh, and getting transport to employment interviews. *Id.* CYF filed a dependency petition related to M.P., and he was adjudicated dependent on September 26, 2018[3]. *Id.* The Court ordered that Mother :

Attend and complete mental health treatment; Obtain independent housing; Complete the Arsenal parenting program; Engage in a drug and alcohol assessment; Connect to services for M.P. (Mother had reported that he had an autism diagnosis). *Id.* at 84.

In December 2018, Mother obtained housing in the West Mifflin area of Allegheny County. *Id.* at 86. Mother was having supervised visitation with M.P. during this time and attending consistently. *Id.* M.P. was successfully evaluated and ruled out for autism. *Id.* at 87. However, around that time, Dr. Patricia Pepe[4] diagnosed him with Oppositional Defiant Disorder. M.P. was still with S.B. at the time. *Id.* S.B. requested that M.P. be removed at the time due to physical aggression against her and her pets. *Id.* at 88. The behaviors S.B. reported were consistent with the behavior that Ms. Wayne had previously observed. *Id.*

M.P. was then moved to another traditional foster home via Pressley Ridge. *Id.* at 89. It was a home with four children. *Id.* at 89. He stayed there until July 2019. *Id.* He was asked

---

[2] It should be noted that there was significant testimony – at times conflicting – about whether Mother signed Releases of Information, when they were signed, and whether they were useful. The Court's conclusions about that testimony will be discussed later in this Opinion.

[3] M.P. was adjudicated by the Honorable Guido DeAngelis, who retired in December 2021. This Court took over this case in January 2022, at which time it was being overseen by a Hearing Officer for permanency reviews. Nearly every court order, permanency finding and other decision in this case was made by this Court's predecessor.

[4] Another witness in this matter, whose testimony will be discussed later.

to leave because of his behaviors and because [Mother] kept raising concerns that she believed M.P. was being abused there. *Id.* In July 2019, M.P. was reunified with [Mother] in her home, after having been in foster care for 13 months. *Id.* The agency, pursuant to a recommendation from Dr. Pepe, did not object to reunification because Dr. Pepe believed that it would be very detrimental to M.P. to place him in another foster home. *Id.* at 90. By that time, [Mother] and [Father] were married and expecting a baby. *Id.* at 89. In August 2019, [Mother] gave birth to A.K. *Id.*

The service plan, upon reunification, was for the family to: Work with in-home services at least twice weekly; Participate in Parent-Child Interaction Therapy (PCIT). *Id.* at 90-91. During this time, CYF conducted a home visit following the birth of A.K. *Id.* at 92. Ms. Wayne reported some of the usual acting-out behaviors that she had seen from M.P. in the past. *Id.* at 93. However, the home was safe and appropriate, and there was never an attempt to remove A.K. or file a dependency petition for him at that time. *Id.* Ms. Wayne testified that she asked for a signed Release of Information at that visit and that mother signed it. However, Ms. Wayne did not realize it was signed incorrectly until she got back to the office. *Id.*

## II.    The Abscondence Incident

Ms. Wayne testified that on September 26, 2019, it was reported to her that on the day before A.K. was taken to his primary care physician (PCP) where [Mother] reported concerns about constipation and belly bruising. *Id.* at 97. She reported that [Father] had tried to squeeze or massage A.K.'s belly in the hopes that he would have a bowel movement, but she was concerned about the effect that the squeezing had on the baby. *Id.* The PCP told her to go to UPMC Children's Hospital Emergency Department. *Id.*

6

*[Mother]* allegedly asked whether a CYF referral would be made. *Id.* at 96-97. The PCP said yes because of mandated reporting laws. *Id.* *[Father]* then brought A.K. to Children's Hospital. *Id.* Children's told *[Father]* that A.K. would have to stay overnight for testing. *Id.* *[Mother]* and *[Father]* left with both children before testing and the overnight stay could be completed. *Id.* The E.R. physician called *[Mother's]* phone thinking that they were elsewhere in the hospital. *Id.* *[Mother]* answered the phone but then hung up when the doctor identified herself. *Id.* Ms. Wayne texted *[Mother]* and directed her to take A.K. back to hospital. She did not do so. *Id.* Eventually *[Mother]*, *[Father]* and the kids were located in Tennessee, and all were brought back to Pittsburgh. *Id.* at 99. A.K. had a medical examination in Tennessee and another on October 3rd with the same physician at Children's Hospital in Pittsburgh. *Id.* at 100. He was found to be healthy at both examinations. *Id.*

Subsequently, CYF obtained ECA's for both children. Id. at 106. *[Mother]* and *[Father]* were arrested and charged related to taking the children out of state and both eventually pled guilty to one ⬛ count of Disorderly Conduct (S). *Id.* at 109.

According to Ms. Wayne, *[Mother]* reported to the agency that they left the hospital prematurely because it was late, and they were concerned about A.K. being continuously poked and prodded. *Id.* at 100. *[Father]* said he was concerned about A.K. being traumatized by the experience but also that he himself was sick and needed to leave. *Id.*

The children were brought back to Pittsburgh on October 3rd and, upon their return, A.K. was examined by the same physician that examined him prior to the abscondence. *Id.* at 99. Ms. Wayne testified that the hospital found no injuries or other concerns. Ms. Wayne also

7

stated that CYF assessed ~~[redacted]~~ *Father's* parents as emergency caregivers *and* subsequently placed both children in the home that night. *Id.*

A. Scott Priestley

At the TPR hearing on June 13, 2022, CYF also presented the testimony of Scott Priestley, a retired police lieutenant at the West Mifflin Police Department. *See* Tr. II. at 5. Mr. Priestley testified that the ~~[redacted]~~ *family was* located by the Lewisburg Police Department after the FBI notified them of the family's presence in the area. *Id.* at 10. The Lewisburg Police Department was then able to locate their vehicle and initiate a traffic stop. *Id.* Mr. Priestley testified that when the ~~[redacted]~~ *family was* found: the police discovered the following items in the vehicle: several baggies of suspected marijuana, a marijuana grinder, rolling papers, and a wooden pipe that police suspected was used for ingesting marijuana. *Id.* at 11. Furthermore, their phones were found to be wrapped in aluminum foil, which Mr. Priestley stated is typically done to eliminate any signal being tracked from that phone. *Id.* The phones were confiscated and investigated. *Id.* Mr. Priestley stated that there were texts discovered on the phone sent from ~~[redacted]~~ *Mother's* phone to Reverend Bruce, who was located in Lewisburg, Tennessee. *Id.* at 12. One text message asked for help, and another talked about needing to 'flee right away'. *Id.* ~~[redacted]~~ *Mother* also received a message from Ms. Terri Wayne on the morning of September 26th, informing ~~[redacted]~~ *Mother* that she needed to return the children to Children's. *Id.*

Mr. Priestley further testified that a GoFundMe started by the ~~[redacted]~~ *family* was brought to his attention. *Id.* at 14-15. The GoFundMe was started to raise money to hire an attorney that could help them regain custody of their children. *Id.* Mr. Priestley also stated that ~~[redacted]~~ *mother* and ~~[redacted]~~ *Father* were arrested for endangering the welfare of children,

8

intimidation and retaliation or obstruction in child abuse cases, and subsequently brought back to Pittsburgh. *Id.* at 15-16. The children were transported to a local hospital in Tennessee for an evaluation and the CYF in Allegheny County was contacted. *Id.* The District Attorney made a deal with ~~Mother~~ and ~~Father~~, but Mr. Priestley testified that he did not know the nature of the deal or what happened with the case. *Id.* at 16-17.

B. Joy Hall

CYF presented testimony from Joy Hall, an investigation manager for Corporate Security Investigations, a private investigation firm that provides services for CYF. *See* Tr. II, at 36. On September 26th, Ms. Hall received a referral from CYF to locate ~~Mother~~, ~~Father~~ and the two children. *Id.* at 37. Ms. Hall was able to locate the family in Tennessee. *Id.* at 40. The ~~family was~~ staying at a property that was owned by Reverend Bruce. *Id.* at 49. Ms. Hall further testified the children did not exhibit behavior that stood out to her when she picked them up in Tennessee or during the trip back to Pittsburgh. *Id.* at 50. She also noted that both children were acting appropriate for their age. *Id.* at 57.

## III. Expert Testimony of Dr. Patricia Pepe

The County presented the testimony of Dr. Patricia Pepe as an expert witness in psychology and child psychology. *See* Transcript of Testimony, dated June 3, 2022 ("Tr. 1b"), at 5. Dr. Pepe produced four evaluation reports related to this case and those are contained in CYF Exhibit 1. *Id.* at 6. The salient points from Dr. Pepe's testimony are as follows:

In 2018, ~~Mother~~ was compliant with medication management. *Id.* at 10-11. She was taking a medication called Abilify, and she found it to be helpful. *Id.* at 11. ~~Mother~~

9

was stable, in Dr. Pepe's opinion, and so she recommended reunification as long as there was stable housing. *Id.* at 25. According to Dr. Pepe, her understanding was that [Mother] was compliant with taking her medication until she became pregnant with A.K. *Id.* at 12.

The most recent evaluations that Dr. Pepe did were in 2022. *Id.* at 12. She conducted an MMPI-2 personality test on [Mother] because she wanted to get an objective measure of [Mother's] functioning. *Id.* at 13. She diagnosed [Mother] with a personality disorder, which she claimed to have always been a diagnosis since her first interaction with [Mother] *Id.* at 20. She opined that personality disorders are enduring and hard to deal with because people with personality disorders often feel victimized. *Id.* She opined that if [Mother] had been in consistent mental health treatment, her personality profile would look differently. *Id.* at 38. Overall, Dr. Pepe diagnosed her with: PTSD, General Personality Disorder, and Bipolar Disorder (by history).

She evaluated [Mother's] most recent 2022 interactional evaluation with the boys as "fairly positive." *Id.* at 39. [Mother] was comfortable with both of her sons. *Id.* at 43. She believed that the abscondence to Tennessee had a deep impact on M.P. and affected the relationship between [Mother] and M.P.. *Id.* at 38. Nonetheless, she testified that M.P. has repeatedly expressed that he misses his mother, loves her, and wants to be with her. *Id.* at 46. She also testified that he wants to feel safe and have permanency. *Id.* She believed that M.P. has a primary bond with his foster parents and that there was no spontaneous physical interaction with [Mother]. *Id.* at 57. She did not conduct an evaluation of both [Mother] and [Father] with the boys together. *Id.* at 59.

Dr. Pepe also evaluated [Father]. Dr. Pepe testified that although his rating scales were within the normal limits, she believed [Father] had some sort of

10

personality disorder. *Id.* at 50-51. She opined that his social engagement is atypical. *Id.* She opined that ~~*Father*~~ does not have the primary attachment with either child. However, his interactional with A.K. presented no major issues for her. *Id.*

## IV.     Parent Goals & Progress

### *Mother's* ~~goals~~

**Obtain and maintain stable housing:** At the time of the hearing, ~~*Mother*~~ and ~~*Father*~~ resided in a 3-bedroom apartment. The home was last assessed in May 2021, and it was assessed as appropriate. There was a history of them living at multiple addresses, including with family. There was also a time in October 2019 where they had been evicted due to unpaid rent. However, Ms. Wayne believed that ~~*Mother*~~ and ~~*Father*~~ had made great progress on that goal.

**Engage in appropriate and ongoing mental Health treatment:** As has been previously discussed, ~~*Mother*~~ reported a long mental health history to the agency, which is why this became a goal in the case. According to Ms. Wayne initially, all of ~~*Mother's*~~ mental health treatment had been self-reported to the agency. However, as her testimony progressed, it became clear that ~~*Mother*~~ has provided some documentation regarding billing for services, but nothing that shows her actual attendance at mental health sessions. According to Ms. Wayne, ~~*Mother*~~ had "never" properly filled out a Release of Information for CYF. However, on cross-examination there was significant testimony about the topic of releases:

May 2021: Ms. Wayne received validly signed Releases of Information from ~~■~~ ~~*Mother*~~ They had been filled out for both Mercy Behavioral Health and WPIC with the help of a service coordinator. Ms. Wayne submitted both of those forms

11

to the respective agencies and neither responded to CYF's request for records.

Ms. Wayne testified that when she called Mercy Behavioral Health to follow-up they told her they needed a new one, but did not say why.

<u>May 2022:</u> Ms. Wayne told [Mother] and [Father] that the releases were out of date and [Father] asked her to send out new ones. The forms were sent back but there was some sort of delay in doing so.

**Parent coaching:** [Mother] successfully completed Arsenal parenting class in 2018 or 2019. She was on a waitlist for PCIT in 2019, but was removed during her abscondence to Tennessee. She was referred for therapeutic alternative parenting services in 2021, but the service provider declined to accept the family for service and did not provide a reason for doing so.

**Maintain Employment:** [Mother] has had multiple jobs during the time of involvement with the agency. She provided proof of employment at Amazon through her counsel but Ms. Wayne was unclear about whether that was still her current employer. During her testimony, [Mother] testified that she was currently employed part-time at a restaurant called The Yard as a cook.

**Participate with In-Home Services:** [Mother's] work with in-home services stopped in 2019. According to Ms. Wayne, there was a comprised ability for [Mother] to access some services due to COVID. Most services have been resumed for about one year but there are still staffing issues, which can limit a family's access to services.

**Visitation:** The primary witness on the matter of [Mother's] visitation was Laura Burlbaugh. *See* Transcript of Testimony, dated June 3, 2022 ("Tr. I") at 15. Ms. Burlbaugh is a

12

treatment coordinator for Pressley Ridge and a foster care caseworker. *Id.* Among her duties was to be an intermediary between the child's biological and foster family for visitation. *Id.* at 16. In her role, she was able to both observe visits between [Mother] and M.P., as well as receive reports from others regarding those visits. *Id.* She authenticated CYF Exhibit 2, which are the visitation notes from [Mother's] visits.[5] *Id.* at 36-37. Ms. Burlbaugh testified that [Mother] visited with her children consistently. *Id.* at 41. Since March 31, 2020, there were a total of 28 missed visits – 14 were the fault of [Mother] and 14 were due to non-parent fault. *Id.* Additionally, Ms. Wayne testified that there was a period of 7-8 months where [Mother] could only visit virtually due to COVID. Ms. Burlbaugh testified that generally, [Mother's] interactions with the boys were fine. *Id.* at 43. [Mother] usually brought games and activities for the children. *Id.* She did observe that [Mother] has consistently struggled with engaging both boys at the same time, in part because M.P. would become agitated when the focus was not on him. *Id.* She testified that she saw affection flow both ways – from [Mother] to the boys and vice versa. *Id.* at 44. It was her opinion that it was clear the boys loved their mother. *Id.*

Ms. Burlbaugh testified that she saw M.P. exhibit behavioral issues that have been described by other witnesses both with [Mother] and with the foster parents. *Id.* [Mother's] parenting strategy has largely been to ignore the behaviors, and to ask visit staff to do the same. *Id.* at 45. Ms. Burlbaugh testified that the strategy was not effective. *Id.* When that strategy was not effective, [Mother] would sometimes end visits early because [M.P.] was unable to calm down. *Id.* at 45-46. Ms. Burlbaugh testified that [Mother] did not appear to be the cause of M.P.'s behavioral issues during visits. *Id.* at 46.

[5] These visitation notes were admitted as a business record only and subject to double hearsay restrictions without additional exceptions to cover additional hearsay.

*Mother*
had an occasionally contentious relationship with visit staff and there was significant focus placed on this issue by the County. Ms. Burlbaugh testified, however, that there are times when staff corrects *Mother* and, although she may ignore them, she does respond to the redirection. *Id.* There was much focus placed on a disagreement regarding a birthday party that she wanted to have for M.P. in December 2021, and on home-grown herbs that she brought to visits. For reasons that will be discussed later in this opinion, the Court did not find the emphasis placed on these issues to be warranted. *Mother* was prohibited from bringing food for M.P. but it was not due to any behavior or misconduct on her part. *Id.* at 51-52. Ms. Burlbaugh never saw any propensity of *Mother* to be violent towards the children and has never witnessed any conduct by *Mother* that would endanger the children. *Id.* at 81. The County did not put on any other witness to court-ordered visits.

*Father's* Goals

**Obtain and Maintain Stable Housing:** The report from CYF was the same as *Mother's* in sum and substance.

**Maintain Employment:** Ms. Wayne's testimony was largely based on self-report from *Father*. See Transcript of Testimony, dated June 13, 2022 ("Tr. Ia") at pg. 153. *Father* reported having several medical concerns since 2019 which led to periods of unemployment. *Id.* Nonetheless, he has been employed for the most part, but could improve on his stability in maintaining jobs, according to Ms. Wayne. *Id.*

**Participate in mental health treatment:** Ms. Wayne acknowledged that this only became a goal for *Father* because he disclosed that he was experiencing anxiety and depression as a result of CYF's involvement with his family and his incarceration as a result of

14

the Tennessee incident. Prior to his disclosure in that regard, there was no information about a history of mental health treatment, nor had the agency received any reports of concern in this regard. Nonetheless, it has been a court-ordered goal since 2019 and, as of the time of the hearing, no proof of mental treatment has been provided. At the time of the termination hearing, CYF was requesting a clarification of ~~████████~~ [Father's] diagnosis, if any, and the appropriate level of treatment.

**Visitation:** ~~████████~~ [Father] has had liberal supervised visitation at the home of his parents since A.K. was placed with them at approximately 8 weeks old. He was visiting several days a week at first and then there were several months in 2021 where he did not visit at all. At the end of 2021, he resumed visits with A.K. and is currently visiting approximately every other month. ~~████████~~ [Father] reported to CYF that the reason for his reduction in visits was because of the cost of gas to attend the visits was prohibitive and he wanted to use the money they had to go to ~~████████~~ [Mother] for her visitation. He was offered gas cards by the agency but did not ever take advantage of that offer. In May 2021, ~~████████~~ [Father] asked his parents whether ~~████████~~ [Mother] could visit A.K. at their house along with him, but his parents declined to do that. ~~████████~~ [Father] reported seeing A.K. regularly both at his parents' house and at his grandmother's house, and that they have a great relationship with one another.

~~████████~~ [Father] does not currently visit with M.P. There was an unfounded ChildLine in May 2020 involving M.P. and ~~████████~~ [Father]. Visits resumed after that time but then stopped again due to transportation and logistics. No witness, including the parents, seemed to have a clear understanding of why ~~████████~~ [Father] is not visiting with M.P. but there is no court-ordered prohibition against it.

Family Teaming Meetings

15

According to Ms. Wayne, [Mother] attended family teaming meetings alone until she and [Father] were married and then he began attending as well. They have missed approximately 3 meetings during the life of the case. Some were hostile between the agency and the parents and had to be terminated early. More recently, since obtaining private counsel, their lawyer speaks during the meetings, but they do still attend.

## V.    Testimony of the Parents

Both [Mother] and [Father] provided testimony, the pertinent portions of which will be summarized here.

[Mother] testified that her full legal name is [J.m.F.] and that [m.] is a family nickname. At the time of her testimony she lived in McKeesport, PA with her husband, [Father] and was employed part-time as a cook in a restaurant. They two have been married since 2019. They have been living in their current housing for two years. Prior to that, they have experienced some of the same housing instability as many people whose employment situations changed, but what ultimately led to their eviction in 2019 was being arrested in Tennessee and not being able to pay for their final month or so of rent.

[Mother] described her initial contact with CYF as being for the purpose of getting assistance. She had just relocated from Philadelphia and was focused on getting housing. She described that as being when she was the most forthcoming because she did not believe she had to hide anything. However, she described that, over time, she perceived that anything she told to CYF personnel was reported back differently than what she had said and that often things were blown out of proportion. Examples of this that she provided included: questions about her Native American heritage (presumably for ICWA purposes), the relationship between her sons, issues

16

around the signing of releases of information and the scheduling of a home visit. Over time, ▇ Mother ▇ described, essentially, a breakdown in the relationship with CYF because of her perception of how the case was being handled.

She described her concerns about M.P.'s current foster care placement. She reported that M.P. was calling the foster parents "Mommy" and "Daddy" within a couple of weeks of being in the placement. Around the same time, he started calling ▇ Mother ▇, "▇ M. ▇," "Ms. ▇ m. ▇," and/or "Mommy ▇ m. ▇." He had never referred to his mother by any of those names before nor had she even told M.P. her first name. M.P. also began asking her whether he was getting adopted and whether it was illegal for him to go home with her. Moreover, she indicated that she had repeatedly expressed concerns about marks, scratches and even black eyes on M.P. She insisted that she never directly accused anyone of anything, and only recently began receiving updates about M.P. in foster care.

She relayed that she had been seeing the same therapist consistently for more than two years and that she even followed the therapist from one practice to another. On cross-examination, she acknowledged that she had just acquired the records in June 2022, and she had not done so earlier because she did not believe it was her responsibility. Ultimately, she denied having ever intentionally incorrectly filled out a release of information form. She acknowledged that she is not regularly taking medication but said that medication was not the focus of her treatment. However, she did testify that she had been prescribed Klonopin and that she used it for panic attacks. She acknowledged her mental health issues but said that, on a daily basis, they affect her minimally and do not prevent her from being able to function normally.

With regard to visitation, ▇ Mother ▇ reported that she enjoyed visitation with her sons. She agreed with Ms. Wayne regarding the number of visited she'd both attended and missed. She

17

did note the difficulty of visitation during the time of virtual visitation because of COVID. She also provided explanations (as well as evidence in the form of email communication between she and CYF) regarding the birthday party incident and the herbs incident. *See* Exhibit 5.

*Mother*
[redacted] acknowledged the Tennessee incident was a result of poor decision-making and was a bad idea. During her testimony she provided some explanation about having a pre-planned vacation there, but also acknowledged using foil to wrap her phone so that her whereabouts could not be tracked.

*Father*
[redacted] also provided testimony. In relevant part, he testified that he and [redacted]
*Mother*
[redacted] are in a supportive, happy marriage. He confirmed that they live in a spacious apartment with enough room for both children and that they are both working as much as possible.

*Father*
[redacted] gave his account of the Tennessee incident. He indicated that, at the time, A.K. was between nursing and getting an iron-rich formula for food. He became constipated and irritable for about two days. A.K.'s stomach was bloated. *Father* [redacted] attempted to do a stomach massage in order to get A.K. to have a bowel movement. He had no intention to hurt A.K. but about an hour later he realized that he had gotten overly zealous because there were bruises on A.K. The next day, they took A.K. to the doctor's office. At the same time, he (*Father* [redacted]) was also sick. In any event, A.K. had a bowel movement as soon as they got to the doctor's office.

While they were at the doctor's office, *Mother* [redacted] made the comment about the doctor being a mandated reporter and he perceived that it made the doctor uncomfortable. The doctor told them to go to the hospital so they went and got M.P. and went to the hospital. The hospital

18

process was taking long, both children were highly irritated and he felt as though enough had been done. The family left the hospital and went home.

According to [Father], they had been planning a trip for a while. So the next day they left to go to Tennessee and also planned to go to Florida to see [Mother's] family. According to [Father], they planned to return in about 7-10 days and he also was unaware that they were not permitted to leave the jurisdiction with the children. He also said that he had no idea about the alleged texts sent by [Mother] during the time that they were departing and/or driving to Tennessee.

With regard to mental health treatment, [Father] indicated that it was his understanding that CYF never directed him to have mental health treatment. He had a POWER evaluation that suggested he continue the mental health treatment that he was already receiving on his own at the time. The therapist that he was seeing at the time left the agency where he was seeing them. He went to a different therapist briefly, and is currently looking for a new one. He indicated that he had last met with a service coordinator in May 2022 and that he had not had any prescription medication in more than a year. He stopped attending group therapy because he found it to be unhelpful as it was focused on wellness, not on specific mental health issues.

He testified regarding one major mental health episode in October 2021. It was a voluntary stay precipitated by the circumstances of this case. He said that the stress of the case had been building for him. The previous judge in his case had announced he was retiring and that there would not be any additional proceedings until April 2022. He felt despondent about his children coming home and he had a suicide attempt. He voluntarily admitted himself to WPIC. They told him to continue in the treatment he was doing at the time and they would put him on a

19

list for expedited individual therapy services. They prescribed him a medication but he does not remember the name of it, however, he was not currently taking it.

*Father*

███████████ testified that his understanding is that the only diagnosis he had was generalized anxiety disorder and his only other mental history is that he had another suicide attempt as a teenager. He provided other testimony regarding his employment and housing history. He also testified regarding a strained relationship between his family and *Mother* ██████. Overall, he felt that CYF had been a destabilizing presence in his family's life.

## STANDARDS

In cases involving the termination of parental rights, "[the appellate court's] standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child." *In re C.W.U., Jr.* 33 A.3d 1,4 (2011) (quoting *In re I.J*, 972 A.2d 5,8 (Pa.Super.2009)). It is well-established that:

> When applying this standard of review, an appellate court must accept the findings of fact and credibility determinations of the trial court if they are supported by evidence of record. *Id.* Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion. *Id.* An abuse of discretion is found where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. *Id.* at 359 (citing *S.P.*, 47 A.3d at 826).

*In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

Furthermore:

> The trial court's decision, however, should not be reversed merely because the record would not support a different result. [The appellate court has] previously emphasized its deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. [internal citations omitted].

20

*In re T.S.M.*, 71 A.3d 251, 267 (2013).

The termination of parental rights can result in permanent consequences for both the parent and the child. *Id.* at 591. Thus, "in recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence." *Id.* Clear and convincing evidence is evidence that it is "clear, direct, weighty [...] and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quoting *Matter of Adoption of Charles E.D.M.*, II, 708 A.2d 88, 91).

Pursuant to 23 Pa. C.S. § 2511(a), a parent's rights can be terminated on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

[...]

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

[...]

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

21

[...]

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa. C.S. § 2511.

## DISCUSSION AND ANALYSIS

The theme throughout the County's presentation of evidence is that the parents' behavior is inappropriate and impulsive due to untreated mental health issues. In the County's view, the abscondence to Tennessee is the pinnacle of that failure to get treatment and shows the danger inherent in having M.P. and A.K. reunify with ~~Mother~~ and ~~Father~~.

This Court disagrees with the County's assessment and finds that the County failed to meet its burden of proof and thus declined to terminate ~~Mother's~~ rights to A.K. and M.P., and ~~Father's~~ rights to A.K. The analysis used in determining whether to terminate parental rights is two-fold. *In re N.A.M.*, 33 A.3d 95, 99 (2011). First, the Court must assess the conduct of the parent. *Id.* Then, the moving party must prove "by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* at 99-100. It is only when the Court determines that the parent's conduct is such that a termination of parental rights is warranted, that it engages with the second part of the analysis. *Id.* at 100. The second prong of the analysis focuses on Section

22

2511 (b), which considers "the needs and welfare of the child under the standard of best interests of the child." *Id.* One aspect of this analysis that the court examines is "the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *Id.*

There are three incidents focused on by the County that this Court believes bear addressing, in turn:

**The Tennessee Abscondence**

There is no question in the Court's mind that [Mother] and [Father] made an intentional decision to leave the jurisdiction following the Children's Hospital incident. The Court finds, based on the testimony and reasonable inferences therefrom, that they were afraid of another removal of the children. However, the Court does not find that their intent was to stay permanently or never return to Pittsburgh. They left a substantial amount of their personal belongings behind. The Court finds that [Mother] was the primary driving force behind this incident. The Court also finds that [Father's] testimony was the most credible and thorough around the incident and the events that led up to it. The Court is not convinced that [Father] was attempting to hurt or abuse A.K. However, given the circumstances of their involvement with the agency, the Court believes that the couple intentionally fled because they believed CYF would initiate another removal.

**The Birthday Party Incident**

23

In short, the Court finds that this incident was precipitated in large part by the County's failures. [Mother] sent an email with a clear request that she be able to have a birthday party for M.P. with food. The language of the email is clear. She also got a clear response that she was able to do that.[6] When the day of the party came, [Mother] came to have what she reasonably believed was a sanctioned event. The failure of those who supervise visits to know what had been approved led to a situation where a young child saw what was set up for him and his mother was put in the position of appearing as though she was doing something wrong. Supervised visitation situations are already inherently difficult and tense. One or more adults is closely monitoring every interaction, every conversation, and every meal a parent is having with their child. [Mother's] reaction was one of frustration and understandable anger after she had followed the proper channels to get approval for the party. The Court does not find this to be evidence of a mental health episode, poor parenting or other reason to weight in favor of termination.

**The Herb Incident**

Throughout this proceeding, the County tried to weave in a theory that [Mother] perceived herself to be "a witch" and/or was trying to hurt or help herself and others with natural herbs. The theory was unconvincing to the Court. However, apparently, there were a few visits where mom brought herbs that she was growing at home (or showed herbs during a virtual visits) to show to M.P., have him smell, do a project with during the visit, and even taste one time. There is nothing in the record that shows the interactions were dangerous, harmful, or otherwise negative in any way. Staff told [Mother] that M.P. could not eat the

---

herbs because they were not sure what they were, and ~~Mother~~ *Mother* complied with that order. Nonetheless, there was just nothing wrong with these interactions and the implication by the County was a stretch at best to attempt to show that ~~Mother~~ *Mother* is a danger to her son(s).

The appellate court must only "agree with the trial court's decisions as to one subsection of 23 Pa.C.S. § 2511(a) in order to affirm the termination of parental rights." *Id.* However, in the present case, the grounds for termination of parental rights are unfounded. The County failed to prove that ~~Mother~~ *Mother* and ~~Father~~ *Father* were incapable of caring for their children. Both parents have taken reasonable steps to remedy the agency's concerns. Furthermore, neither parent has displayed behaviors that are of such a nature that termination would be required under section (a)(2). According to our Supreme Court, the test for terminating parental rights pursuant to section 2511(a)(2) requires a showing of the following:

> Firstly, the repeated and continued incapacity, abuse, neglect, or refusal must be shown; Secondly, such incapacity, abuse, neglect, or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and lastly, it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*Id.* at 100 (citing *In re Geiger*, 331 A.3d 172 (1975).

The County did not produce sufficient evidence to support a finding of abuse. Even so, "the grounds for terminating parental rights under 2511(a)(2) are not limited to affirmative misconduct." *Id.* These grounds can include "acts of refusal as well as

25

incapacity to perform parental duties." *Id*. Both [Mother] and [Father] have had ongoing employment and housing, with few interruptions during the life of the case. Moreover, the County has not met its burden of showing that [Mother] and [Father's] mental health adversely affected their ability to parent M.P. and A.K. such that termination is warranted.

The County also failed to prove that that there are conditions that still exist which led to the removal. *See* Section 2511(a)(5). [Mother] has been in treatment consistently since the Tennessee abscondence incident (which was the precipitating event for the removal leading to this proceeding). [Mother] credibly testified about her current insight into that incident such that the Court is convinced that she understands what was wrong about it and it is unlikely to be repeated. It also bears stressing that this *is* the precipitating incident because the children were reunified with their parents prior to the abscondence, [Father] voluntarily hospitalized himself, sought appropriate treatment, and engaged in outpatient treatment appropriately.

This Court does not agree that is in the best interests of M.P. and A.K. to have their relationships with their parents terminated. M.P. has repeatedly expressed love and affection for his mother and although he has also expressed a desire for permanency, this Court is not convinced that placement in foster care with six other children is the permanency that he needs. [Mother] has an appropriate understanding of his behavioral issues and parenting needs and the Court believes [Mother] and M.P. still have a bond that is intact and able to flourish. A.K. has been with his paternal grandparents since the beginning of his removal. He has maintained regular visits with both of his parents and this Court has no concerns about his bond with either parent. The Court also credits the

26

testimony of [Father] that his family will continue to put the interests of the children first. As such, the Court believes that A.K.'s bond with his grandparents can and will continue even once he is returned to his parents. Moreover, that [Father's] parents will continue to be a support for the couple and their sons.

The Court found most of the witnesses to be largely credible with a few notable exceptions. First, the testimony of Dr. Pepe was confusing and not particularly helpful to the Court. She was combative on cross-examination, which was troubling given that she is a seasoned expert. Dr. Pepe testified live in the courtroom, so the Court was able to observe her demeanor. She did not come across as an objective expert witness providing her opinion, but rather as a deeply invested partisan. In fact, as it turns out, she incorrectly opined that [Mother] had not been in mental health treatment consistently because of her "personality profile." On one hand, Dr. Pepe testified that someone with [Mother's] personality disorder would withhold information in strategic ways but also testified that she felt [Mother] was open and forthcoming with her, including about the incident with A.K. but characterized it as isolated.

With regards to [Father], she testified that his clinical scales were within normal limits but also opined that he may have either social anxiety or a schizoid personality disorder. Overall, the Court was unable to rely on Dr. Pepe's testimony as providing much insight into the mental health conditions of either parent. This is not to say that the Court does not believe that there are issues that need to be addressed. Dr. Pepe, however, provided little to no help with that issue. Second, the testimony of [blank]. [Mother] had what can only be described as peaks and valleys. There were issues on which the Court found [Mother] to be forthright, earnest, and clear. There were other issues

27

where she was clearly not being truthful. Third, although the Court found Ms. Wayne to be the most helpful and most credible witness presented by the County, there was one issue within her testimony that gave the Court pause. Specifically, the testimony about the releases of information for treatment. Ms. Wayne testified at one point that the County had never received a properly executed release of information for ~~_____~~ [Mother] in order to get mental health records. At other points, she testified that she did receive at least one properly executed release that she was able to submit to service providers, and at yet other points, it was unclear at best what was happening with the releases of information. As a result, the Court is left with a draw as to what extent ~~_____~~ [Mother] and ~~_____~~ [Father] did nor did not provide valid releases of information and to the extent they did not, whether it was intentional.

Ultimately, the County failed to meet its burden of providing clear and convincing evidence that termination of parental rights was required under the statute.

For the foregoing reasons, this Court's Orders should be affirmed.

BY THE COURT:

_____ J.

28